**Gerald E. GAULL, M.D., Plaintiff,**

v.

**WYETH LABORATORIES, INC. and Wyeth International, Ltd., Defendants.**

**No. 87 Civ. 7618 (CLB).**

United States District Court, S.D. New York.

May 3, 1988.

Ivan S. Kavrukov, Lois Sylor Yohonn, Cooper, Dunham, Griffin & Moran, New York City, for plaintiff.

Michael J. Sweedler, Beverly B. Goodwin, Darby & Darby, P.C., New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

Plaintiff, Dr. Gerald E. Gaull, is the inventor of Patent No. 4,303,692, " '692 patent"), for a synthetic infant milk formula which contains taurine, an amino acid, in amounts approximating the taurine content of human milk. This patent is based upon the claim that adding taurine to infant formula "appears to provide an improved or superior nourishment to human infants." Dft. Ex. A.

Dr. Gaull brought this suit pursuant to 35 U.S.C. Sec. 271 against Wyeth Laboratories, Inc. and Wyeth International, Ltd. ("Wyeth") for deliberate and wilful infringement of the patent through the manufacture and sale of synthetic infant formula fortified with taurine. Wyeth denies infringement, and claims that the patent is invalid and unenforceable due to lack of utility, obviousness, inequitable conduct before the United States Patent and Trademark Office ("Patent Office") and misuse. Wyeth also counterclaims that if the Court finds the patent valid and enforceable, that Gaull misled Wyeth as to its value by misrepresenting the results of a Wyeth-funded study and should be ordered to give Wyeth the right of first refusal to purchase Dr. Gaull's proprietary rights in the patent. A protective order in this action was entered by the Court on December 29, 1987.

The Court now considers seven separate motions. On February 2, 1988, plaintiff moved for production of documents relating to the issue of wilfulness, which Wyeth refused to produce on the ground of attorney-client privilege. The remainder of the motions were argued at a hearing before the Court on April 8, 1988, and were marked fully submitted on April 18, 1988, upon receipt of supplemental memoranda from Dr. Gaull and Wyeth. A brief summary of the relevant alleged or historical facts leading up to these motions is necessary.

Dr. Gaull applied for a patent on the taurine-fortified formula in 1976, which was granted on December 1, 1981. The application had been rejected six times by an examiner in the Patent Office, primarily on the basis that Dr. Gaull failed to substantiate his contention that taurine supplementation provided improved and superior nourishment to human infants. Dr. Gaull was represented throughout the application process by Thomas Moran, Esq., a partner of his current counsel in the law firm Cooper, Dunham, Griffin & Moran.

Dr. Gaull engaged actively in research in the field of infant nutrition. In one study conducted in the early 1970's Dr. Gaull observed that taurine levels in urine and blood were lower in infants fed synthetic formula as compared to infants fed human milk. ("Helsinki I study"). This information was published in 1975. Wyeth contends that this observation resulted in the '692 patent, was prior art and should

have been disclosed to the Patent Office. Dr. Gaull disputes its characterization as "prior art," and further claims that it was disclosed to the Examiner.

Dr. Gaull, along with other scientists, also commenced a study of preterm infants to determine the nutritional effects of supplementing infant formula with taurine. ("Helsinki II study"). This study was sponsored in part by Wyeth. The Helsinki II study led to several observations, among them: supplementing infant formula with taurine does not affect the growth and metabolism of infants studied; taurine supplementation results in blood and urine taurine levels equivalent to those found in infants fed human milk; and preterm infants fed formula supplemented by taurine remain taurine conjugators of bile acids. The conclusions of the Helsinki II study were published in five scientific papers in 1983, two years after the '692 patent was awarded. Wyeth contends, however, that the basic results were known to Dr. Gaull prior to the his interview with the Patent Office.

As was noted above, the patent application of Dr. Gaull was originally rejected six times in the Patent Office, primarily due to lack of utility. In its fifth rejection, dated May 29, 1979, the Examiner explained that the "function of taurine in infant nutrition is still a matter of speculation" and "the exhibits [materials submitted in support of its application] are still not believed to convincingly establish that synthetic infant formula containing taurine provides improved or superior nourishment." Def. Ex. D at M221–222. In his sixth application Dr. Gaull submitted the bile acid data from the Helsinki II study. The Patent Office, however, rejected the application for a sixth time, finding that the bile acid data was inconclusive as to improved nutrition.

Dr. Gaull responded to this rejection from the Patent Office by requesting an extension of time so that data could be collected to show that the addition of taurine to a synthetic infant milk formula provided superior infant nutrition. Def. Ex. D at M378–79. Dr. Gaull and his attorney, Mr. Thomas Moran, also had a personal interview with the Examiner at the Patent Office on April 21, 1981. At this meeting they presented additional data in support of the application, which included: a paper which indicated that infant monkeys supplied with synthetic formula free of taurine showed growth depression relative to monkeys fed formula to which taurine was added ("the Monkey Paper"); data from the Helsinki II study regarding the taurine levels in the blood and urine of infants; and data that reflected a conclusion that human lymphoid cells grow less well in taurine deficient culture media than in culture medium containing taurine.

Mr. Moran summarized the substance of this meeting as part of an amendment to Dr. Gaull's application filed on May 5, 1981. Def. Ex. E. at M00380—00391. After the additional data and information supplied during the interview was evaluated by the Examiner, Dr. Gaull was awarded the patent on December 1, 1981.

Dr. Gaull did not present to the Examiner data from the Helsinki II study showing no difference in metabolism and growth rate between infants fed synthetic formula with taurine and those fed formula without it. Wyeth maintains that the information was material, and Dr. Gaull knew of its importance, in light of the Examiner's reliance on the Monkey Paper as representative of the growth affects of taurine on infants. Dr. Gaull claims that he did not mention the results to the Examiner because they were self-evident, in that the study lasted only four months, and for ethical reasons no scientist would perform growth-stunting experiments on human infants. In addition, Dr. Gaull stresses that the Monkey Paper contained itself qualifying statements as to its usefulness in predicting similar results in humans.

In 1984 Abbott Laboratories, the largest company in the infant formula industry, purchased the '692 patent from Dr. Gaull. Abbott marketed its product, touting the benefits of taurine. A dispute developed between Dr. Gaull and Abbott Laboratories, and Dr. Gaull filed a lawsuit to regain the patent. *Gaull v. Abbott Laboratories,* Civil Action No. 84 C. 8895 (N.D.Ill.) (Hart,

J.). This suit was settled in 1987 under terms the parties agreed would remain confidential. Under the agreement, Dr. Gaull regained rights to the patent, and Abbott Laboratories became a licensee.

In 1985 Wyeth decided to add taurine to its infant formulas, due to new clinical evidence showing nutritional benefits and competitive pressures. Pl.Ex. 7. Wyeth marketed its taurine-fortified formula as containing a physiologic level of taurine and as nutritionally closer to human milk than other brands of infant formula. Pl.Ex. 10. Dr. Gaull then brought this action for infringement.

*Defendants' Motion to Disqualify Counsel for Plaintiff*

Wyeth moves to disqualify counsel for Dr. Gaull pursuant to Disciplinary Rule 5–102(B) of the ABA Code of Professional Responsibility which states:

> (B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or if it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

Wyeth asserts that the testimony of Mr. Thomas Moran, a partner of Dr. Gaull's counsel in this case, is necessary to its inequitable conduct defense. Wyeth claims that Mr. Moran's testimony is necessary and prejudicial to Dr. Gaull since it will establish materiality and knowledge of the human growth data withheld from the Examiner.

Courts should be reluctant to disqualify attorneys absent a showing of a "taint" to the underlying trial, because disqualification denies the client his choice of counsel, results in delay, adds to litigation costs, and is often interposed for tactical reasons. *SMI Industries Canada Ltd. v. Caelter Industries,* 586 F.Supp. 808, 814 (N.D.N.Y. 1984). *See also Board of Educ. of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979). A trial may become tainted when an attorney's conflict of interest in violation of Canon 5 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client. *Nyquist,* 590 F.2d at 1246.

■ The Court concludes that disqualification is inappropriate in the circumstances of this case, since Mr. Moran is not a necessary witness. The Court now prohibits either party from calling him as a witness. The Court finds that his testimony, where relevant to the issues involved in this case, would be merely cumulative to the written record of the interview with the Examiner which is part of the Patent Office's file, and to Dr. Gaull's testimony.

An amendment to Dr. Gaull's application submitted by Mr. Moran several days after the interview with the Examiner summarizes the events of the meeting. Dft. Ex. E. This record is admissable to prove what was told to the Examiner, and should duplicate the testimony of Mr. Moran regarding the substance of the interview. Any additional testimony from Mr. Moran regarding his own thought processes prior to and during the meeting would be irrelevant, since the Court is only concerned with what was actually told the Examiner during the meeting, and what he was not told.

■ The Court recognizes that if Mr. Moran is prohibited from testifying, Dr. Gaull will be the only participant in the April 21st meeting that will testify as to what transpired. The Examiner is outside the subpeona power of the Court, and his mental processes in performance of his quasi-judicial, decision-making function could not be the subject of examination. *See Schaffer Tool Works v. Joy Manufacturing Co.,* 167 U.S.P.Q. 170 (S.D.Tex. 1970). No material discrepancy has been shown to exist here between the proposed testimony of Dr. Gaull and that of Mr. Moran relevant to the issue of inequitable conduct, that would make Mr. Moran's testimony necessary. Their testimony as to the factual circumstances of the meeting does not differ. Mr. Moran's written report regarding the presentation is admissable to the extent it might amplify the testimony of Dr. Gaull.

*Defendant's Motion for Separate Trial on Issue of Inequitable Conduct*

Wyeth asserts that Dr. Gaull's patent on the taurine-fortified synthetic infant formula is unenforceable due to the inequitable conduct of Dr. Gaull in applying for the patent. Wyeth alleges that Dr. Gaull withheld from the Patent Office clinical evidence from his own study that the addition of taurine to the infant formulas failed to affect growth and metabolism in human infants, and a 1975 prior art publication which suggested the addition of taurine to infant formula may improve nutrition. Wyeth now moves under Rule 42(b), F.R. Civ.P., for a separate non-jury trial on the inequitable conduct issue. This motion is denied.

The defense of inequitable conduct may arise from an applicant's breach of duty to disclose material information to the Patent Office. A successful defense of inequitable conduct requires clear and convincing evidence of knowledge of the information that was not disclosed and its materiality, as well as the intent to mislead by the patentee. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1560 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The general test for materiality is whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the patent to issue. *Argus Chemical Corp. v. Fibre Glass–Evercoat Co., Inc.*, 759 F.2d 10, 14 (Fed.Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985); *J.P. Stevens & Co.*, 747 F.2d at 1559. Intent may be inferred from proof that someone in the applicant's position reasonably would have known that the information was material. *Argus Chemical Corp.* 759 F.2d at 14–15; *J.P. Stevens & Co.*, 747 F.2d at 1564. The thresholds of materiality and intent, when established, are then weighed together and balanced by the Court to determine whether as a matter of law inequitable conduct has occurred. *N.V. Akzo v. E.I. duPont de Nemours*, 810 F.2d 1148, 1153 (Fed.Cir.1987). The less material the withheld information, the greater degree of intent that must be proven for a finding of inequitable conduct. *Id.*

The Court may order a separate, non-jury trial on the inequitable conduct issue, if the interests of justice and judicial economy are served. *Gardco Manufacturing, Inc. v. Herst Lighting Co.*, 820 F.2d 1209 (Fed.Cir.1987). In *Gardco* the Court noted that generally the factual issues involved in the inequitable conduct defense did not overlap the issues, such as infringement and validity, reserved for jury trial, and thus were not so common as to preclude a separate trial. *Id.* at 1213.

This Court concludes that the circumstances of this case do not call for a separate trial on the inequitable conduct defense, and the interests of justice and judicial economy would not be served significantly by ordering such a separate trial. The inequitable conduct and lack of utility defenses involve some overlapping fact questions that render a separate trial less satisfactory. Wyeth's inequitable conduct defense necessarily involves a determination of the materiality of data presented to or withheld from the Examiner, which will most likely raise issues regarding the utility of the invention. In the circumstances of this case, it is possible that the jury findings regarding the utility of the taurine-fortified formula could be affected by any previous findings by the Court regarding the materiality of the human data withheld from the Examiner. Defendant's motion is therefore denied.

*Plaintiff's Motion to Dismiss Defendant's First Counterclaim of Lack of Utility*

Dr. Gaull moves to dismiss the portion of Wyeth's first counterclaim that alleges the patent is invalid due to lack of utility, and for a court order that Wyeth is estopped from raising the issue of utility at trial. Dr. Gaull argues that a finding of utility is required as a matter of law by Wyeth's admitted infringement of the patent, the commercial success in sales of the formula by licensee Abbott, and the fact that Wyeth exactly copied the taurine-fortified formula described and claimed in Dr. Gaull's patent. Since Dr. Gaull submitted

articles and other documents in support of his motion, the Court treats the motion as one for summary judgment pursuant to Rule 56 F.R.Civ.P. The motion is denied, because genuine issues of material fact remain for trial as to infringement and the utility of adding taurine to synthetic infant formula.

Wyeth has repeatedly denied any infringement of the patent in its answer and responses to requests for admissions, and denies admitting infringement at a hearing before this Court on December 27, 1987, for which there is no transcript. Whether infringement occurred, therefore, remains an issue between the parties.

Genuine issues of material fact also exist as to the utility of the invention described in the patent. It is possible for a jury to make such a finding. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 762 (Fed.Cir. 1984). The clinical evidence as to the nutritional affects of the addition of taurine to infant formula is subject to varying interpretations, and must be weighed by the trier of fact. While the commercial success of the sales by Abbott Laboratories is evidence of the utility of the patented formula, it is not conclusive evidence of utility as presented, since the sales may be attributable to the marketing activities of Abbott Laboratories rather than the purported inventive feature of the product. *See Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315–17 (Fed.Cir.1985). In addition, the fact that Wyeth's infant formula contains taurine will certainly be evidence of utility to be weighed by the jury, but it may be explained away by Wyeth as an attempt to respond to competitors' actions in adding taurine to their formulas, or a response to the fact that mother's milk contains taurine and there is a natural desire of most producers of synthetics to follow nature as closely as possible.

*Plaintiff's Motion for Order that Plaintiff's Requests for Admissions 1, 11, 16, 17, and 19 Be Deemed Admitted*

Dr. Gaull submitted requests for admissions to Wyeth pursuant to Rule 36 Fed.R. Civ.P., and Wyeth provided responses, including a general denial, which Gaull found evasive and not fairly meeting the substance of the requests. The requests to admit track the language of the claims, while the responses fail to admit or deny in the specific language of the request. For example, request for admission 1 states that Wyeth has made or sold in this country formula containing "additive thereto taurine at a concentration in the range from about 15 to about 60 micromoles percent," while the response states "Wyeth denies infringement." and that Wyeth admits selling "synthetic infant formula to which taurine at a concentration of about 30 micromoles percent was added." Dr. Gaull moved for an order that the requests 1, 11, 16, 17 and 19 be deemed admitted for the purposes of this action. This motion is denied.

 While the Court finds that the responses do not serve to narrow the issues for trial, the purpose behind Rule 36(a) Fed.R.Civ.P., we conclude that the responses were not made unnecessarily evasive. Wyeth explained that it followed this procedure because the requests, couched in the language of the claims, gave the defendant the choice of denial or unavoidable admission. Wyeth claims it did not use the word "additive" because it thought that "additive" in this context meant a substance added to a formula to provide improved or superior nutrition, and to admit that was tantamount to admitting infringement. To the extent that the responses do not directly track the language of the requests, therefore, they should be deemed denials.

*Defendants' Motion for an Order Compelling Production of Settlement Agreement*

Wyeth moves pursuant to Rule 37(a)(2) for the production of a license agreement, and documents relating to its terms, entered into by Gaull and Abbott in settlement of their litigation, mentioned earlier, involving the '692 patent. The agreement between Gaull and Abbott contains a confidentiality clause in which the parties agreed to keep the terms of the settlement confidential, not to disclose its terms to others except under court order, and to notify each other and afford each other the

opportunity to contest efforts by third parties to seek a court order.

Wyeth contended that these documents are relevant to determining title and the defense of utility, since the plaintiff relied on his licensing agreement with Abbott to prove the commercial success of his patent in his motion to dismiss the defendant's first counterclaim. Wyeth further noted that a protective order has been entered into by the parties.

Abbott has filed papers with this Court in opposition to the motion. Abbott stated that it specifically bargained for the requirement of confidentiality, determining that it would be in its commercial interest to prohibit disclosure of its terms to its competitors, such as Wyeth, and that disclosure would be competitively advantageous to Wyeth and damaging to Abbott. Abbott represented that the agreement has no relevance to the issues of this suit and will not lead to discovery of admissible evidence.

■ After weighing the benefits of disclosure against the overriding policy concerns of encouraging settlement, and the Court denies the motion.

The Court concludes that the settlement agreement is generally irrelevant to the issues involved in this lawsuit. The question of title can be resolved through an examination of the public records of the Patent Office, or by deposition of Abbott limited to that issue. Furthermore, the financial terms of the licensing agreement between Dr. Gaull and Abbott will provide little additional information regarding the commercial success of the patented formula or its utility. Other sources, such as sales statistics and marketing data, can provide more meaningful evidence.

Considering the small evidentiary value of the terms of the settlement agreement, and the chilling effect an order of disclosure of agreements entered into with the understanding of confidentiality would have on future settlement negotiations in other litigation, the Court declines as a matter of policy to order its disclosure. Both plaintiff and defendant are hereby precluded from relying on the existence of the Abbott licensing agreement as evidence in this lawsuit.

*Plaintiff's Motion to Compel Production of Documents Covered by the Attorney Client Privilege*

Dr. Gaull moved pursuant to Rule 37(a)(2) Fed.R.Civ.P. to compel Wyeth to produce documents that relate to the issue of the wilfulness of the infringement, including opinions of counsel which are protected by the attorney-client privilege, or to be precluded from using the privileged material at trial.

■ The Court concludes that Wyeth must elect now or at a date to be fixed in the near future whether to disclose the information or be precluded from introducing the privileged evidence at trial. Wyeth is free to choose to stand behind its attorney-client privilege, and refuse to produce the opinions. As a consequence, however, Wyeth will be precluded from introducing the opinions or testimony of its counsel as evidence that it satisfied its affirmative duty of due care to determine no infringement existed or that it did not act wilfully. If privileged material is to be used at trial, the plaintiff must be allowed to examine the privileged documents, under the terms of the protective order, in order to conduct pre-trial discovery. *American Standard Inc. v. Pfizer Inc.*, 828 F.2d 734 (Fed.Cir. 1987).

Plaintiff's motion is granted, and Wyeth is ordered to notify Dr. Gaull and the Court of its decision to either produce the documents or be precluded from using the material at trial. The Court further holds that production of privileged documents concerning the issue of wilfulness will not constitute waiver of the attorney-client privilege with respect to other documents not germane to the issue of wilfulness.

*Defendant's Motion for a Protective Order*

Wyeth moved for a court order postponing the deposition of Dr. Silverio, director of Clinical Nutrition at Wyeth, until the motion to disqualify counsel was determined, in order to avoid taking his deposition taken twice. Based upon the Court's

denial of Wyeth's motion to disqualify counsel, the Court considers the motion for a protective order moot.

The motions pending before the Court having been decided as explained herein, counsel shall attend at Room 31 in the United States Courthouse, 101 East Post Road, White Plains, New York on May 27, 1988 at 2:00 P.M. for a pretrial conference to establish a schedule for completion of discovery.

SO ORDERED.