Rachel L. DONOHOE, Plaintiff,

v.

AMERICAN ISUZU MOTORS, INC., and Isuzu Motors, Limited, Defendants.

No. 3:CV–92–0839.

United States District Court, M.D. Pennsylvania.

Sept. 13, 1994.

See also 155 F.R.D. 515.

---

John J. Mahoney, Thomas R. Wilson, Crawford, Wilson, Ryan & Agulnick, P.C., West Chester, PA, for plaintiff.

John Q. McShane, Mary E. Bolkom, Anton J. van der Merwe, Minneapolis, MN, Gary L. Weber, Mitchell, Mitchell, Gray & Gallagher, Williamsport, PA, for defendants.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On June 19, 1992, plaintiff Rachel L. Donohoe initiated this action by filing a complaint against defendants American Isuzu Motors, Inc., and Isuzu Motors, Ltd. (collectively, "Isuzu"). Plaintiff alleges that she was involved in a single-vehicle accident while driving a 1986 Isuzu Trooper II designed, manufactured, assembled and/or sold by Isuzu. The accident occurred on November 25, 1988, in Moreland Township, Lycoming County, Pennsylvania. An amended complaint was filed on March 11, 1994, alleging causes of action including: strict product liability (Count I), negligence (Count II), and breach of implied warranties (Count III), and for punitive damages (Count IV).

Before the court are: a motion by defendants for partial summary judgment on plaintiff's claim that a defect in the seat belt design caused or contributed to her injuries; plaintiff's motion for leave to conduct an examination of evidence; plaintiff's motion to compel production of documents; and plaintiff's motion to allow attendance of plaintiff's representatives at any crash testing to be performed by defendant's experts.

### DISCUSSION

#### I. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed.R.Civ.P. 56(c) (emphasis added).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that par-

ty's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 323, 325, 106 S.Ct. at 2552, 2554.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

## II. ISUZU'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In their motion for partial summary judgment regarding plaintiff's seatbelt claims, defendants claim that plaintiff should be precluded from introducing any evidence regarding seatbelt defects based upon spoliation of evidence. Isuzu claims that plaintiff's experts destroyed the seatbelts when a part of the seatbelt was disassembled for examination. The testing was performed by plaintiff's liability expert, Alan Cantor of ARCCA, Inc., and his associate, Donald Eisentraut.

The court held a two-day evidentiary hearing on defendants' motion on August 17 and 18, 1994. At the conclusion of defendants' testimony on their case in chief, the court denied defendants' motion, finding the evidence presented insufficient as a matter of law to demonstrate that probative evidence was in any way destroyed or altered by plaintiff's testing or that such testing rendered it impossible, or even more burdensome, for defendants to refute the seat belt design defect theory advanced by plaintiff.

The reasons for the denial were summarized at the conclusion of the hearing, and we write only to expand upon the reasons stated at that time.

### A. Spoliation of Evidence

The Third Circuit has determined that it need not decide whether this issue is substantive, and therefore governed by Pennsylvania products liability law, or procedural, and therefore governed by federal evidentiary rules and procedure, since the result would be the same no matter which applied. *Schmid v. Milwaukee Electric Tool Corp.,* 13 F.3d 76, 78 (3d Cir.1994).

Under both Pennsylvania substantive law and federal evidentiary law, trial courts have the power to sanction a party who destroys or alters relevant evidence, generally referred to as spoliation of evidence. *Id.* See also *Schwartz v. Subaru of America, Inc.,* 851 F.Supp. 191, 192–193 (E.D.Pa.1994). The Third Circuit stated that whether sanctions are appropriate and the level of sanctions warranted is determined by the following:

1) the degree of fault of the party who altered or destroyed the evidence;

2) the degree of prejudice suffered by the opposing party; and

3) the degree of sanction necessary to avoid substantial unfairness to the opposing party and, if the offending party is

seriously at fault, to deter such conduct by others in the future.

*Schmid,* 13 F.3d at 79 (citations omitted).

■ Sanctions imposed vary depending upon how egregious the conduct was, the impact it will have on the opposing party, etc. The court may, for example, invoke a "spoliation inference," informing the jury that it may infer that the party who destroyed or altered evidence did so because it would have been unfavorable to his side. *Schmid,* 13 F.3d at 78 (citing, *inter alia, Nationwide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214 (1st Cir.1982) (Breyer, J.)). Should the conduct warrant a more severe sanction, the court may preclude the party from introducing any evidence on the subject, with the result that the party cannot prevail as a matter of law on that issue. See *Schmid, supra,* 13 F.3d at 79 n. 2 (citing Pennsylvania cases).

"[D]ismissal of a complaint or preclusion of evidence regarding an allegedly defective product is an extreme sanction reserved only for those instances where an entire product or the allegedly defective portion of a product is lost, spoiled or destroyed." *Mensch v. Bic Corp.,* 1992 WL 236965 (E.D.Pa.1992).

## B. Findings of Fact

Defendants contend that plaintiff should not be permitted to recover on the theory that a defectively designed seat belt caused or contributed to her injuries because disassembly and reassembly of the belt by her experts damaged the seat belt retractor, the component which plaintiff alleges to be defective.

Defendants presented testimony from two witnesses at the August 17–18 hearing: Richard M. Studer and Alan Cantor. Studer testified as defendants' expert on the subject of seat belt testing relative to determining defects and causal factors in an automobile accident. Defendants called Cantor, plaintiff's liability expert, as on cross examination.

Based on the testimony of these witnesses and the other evidence introduced at the hearing, the court makes the following findings of fact:

1. Richard Studer is qualified to testify as an expert on the subjects of: the testing of automobile seat belts for safety and product defects; forensic evidence to be gleaned from the examination of seat belts taken from vehicles involved in a collision; and the causal factors between seat belt design and injuries sustained by the occupants of a vehicle involved in a collision.

2. Studer worked for many years in the field of automotive seat belt design and during the course of his career participated in and observed innumerable test collisions and other trials performed to study the performance, design and reliability of seat belts under varying conditions.

3. Alan Cantor is qualified to testify as an expert on the subjects of: the testing of automobile seat belts for safety and product defects; forensic evidence to be gleaned from the examination of seat belts taken from vehicles involved in a collision; and the causal factors between seat belt design and injuries sustained by the occupants of a vehicle involved in a collision.

4. Cantor is a principal in the consulting firm of ARCCA Inc. (ARCCA) which, among other things, conducts studies on the design and safety of seat belts and the role seat belts play in preventing or minimizing injuries to individuals involved in a crash.

5. Much of Cantor's work has involved studying the role of seat belts in minimizing injuries to military pilots. Information gained in those studies is directly transferable to the field of automobile seat belt design and safety.

6. Cantor also has considerable experience in analyzing the design, safety and performance of seat belts in automobiles.

7. In June, 1993, Donald Eisentraut, an employee of ARCCA, disassembled the Donohoe seat belt retractor to determine whether an alleged design defect in one section of the retractor portion of belts installed in the 1986 Isuzu Trooper II caused, or contributed to, injuries sustained by Rachel Donohoe in the November, 1988 accident.

8. The retractor spring is housed in a separate section of the retractor portion of the belt. That section was not opened by

plaintiff's experts, and they did nothing with the spring portion of the mechanism.

9.   Defendants were not given prior notice of ARCCA's intent to disassemble the retractor mechanism, nor were they given an opportunity to be present during the examination.   They learned of the June, 1993 disassembly and re-assembly by plaintiff's experts only after the fact.

10.   After disassembly, all original components of the seat belt retractor were placed back in the retractor housing.   No part was disposed of, destroyed, damaged or altered in any fashion during the disassembly or re-assembly procedure.

11.   The disassembly and re-assembly of the retractor mechanism were recorded on videotape from beginning to end.

12.   Alan Cantor operated the videotape camera.

13.   Defendants were supplied with a true and correct copy of the videotape, and a copy was made part of the record before the court.

14.   The entire seat belt mechanism remains intact and is in possession of plaintiff's counsel.

15.   Studer examined the ARCCA videotape frame-by-frame and analyzed in detail what was done by Eisentraut during the disassembly and re-assembly of the retractor.

16.   Based on his analysis of the videotape and other factors, Studer opined that Cantor and Eisentraut: a) had improperly rewound the seat belt webbing around the retractor mechanism without layering it with a layer of foam or some other protective cushioning material which would prevent any marks from being made in the webbing which could be mistaken for, or interfere with, forensic evidence [1] on the belt; b) had dropped a metal washer used to hold sprockets in place while disassembling the retractor mechanism; c) may not have replaced the mechanisms inside the retractor in exactly the same position as they were found before disassembly since there is a possibility of more than two hundred combinations of re-assembly by replacing the disassembled parts in more than two hundred different ways; and d) may have damaged the plastic lever in the retractor by not holding the retractor in the proper position when placing the plastic cover back on the mechanism.

17.   Failure to re-wrap the belt by interlayering it with protective foam is of no consequence since there was no forensic evidence on the belt.

18.   Dropping the metal washer had no effect on the retractor and is of no consequence to any issue or sub-issue in this action.

19.   Contrary to Studer's suggestion that the component parts may not have been re-assembled in precisely the same manner as they were before they were removed by Eisentraut, Eisentraut did in fact replace both of the sprockets in precisely the same position as they were before disassembly using reference points which he noted before disassembling the mechanism.

20.   The only part which may not have been replaced in precisely the same position, i.e. in this instance with the same side facing up, is the small metal washer used to hold the plastic sprockets in place.

21.   Failure to replace the washer with the same side up as before disassembly had no effect of any kind on operation of the retractor or on the information discerned by any expert examining the assembly subsequent to the Eisentraut/Cantor examination.

22.   There was no damage to the plastic lever or to any other component of the seat belt retractor from the manner in which Eisentraut replaced the plastic housing.

23.   Studer also commented upon the existence of a white substance on the seat belt webbing, during the disassembly procedure, noting that the white substance is not present on the belt now.

24.   The white substance which Studer noted was from an insect cocoon constructed

1.   In this context, forensic evidence refers to markings on the seat belt webbing which experts could use to discern whether the belt performed as intended in the crash, whether the occupant was in fact wearing the belt, etc.

in the D-ring component of the belt assembly.

25. Neither the white substance observed on the belt webbing during the videotape nor the cocoon itself had any impact on the workings of the seat belt. The cocoon was constructed in a section of the belt system which had no bearing on the mechanical functioning of the belt.

26. All aspects of the disassembly and re-assembly were done in a careful and appropriate manner and were not the cause of any harm to any part of the seat belt webbing, the retractor mechanism or any other component part.

27. Nothing done by Cantor or Eisentraut caused any damage to the Donohoe seat belt or in any way altered or lessened information to be gleaned from the belt by any other expert who may examine it.

28. The re-assembled retractor and other component parts of the Donohoe belt were carefully preserved in a sealed plastic bag.

29. No forensic evidence was destroyed or altered by plaintiff's examination, disassembly or re-assembly of the Donohoe belt.

30. Plaintiff is proceeding on a theory that the seat belt installed in the 1986 model Isuzu Trooper II was defectively designed, because it lacked components essential to prevent a phenomenon known as skip locking.

31. Skip lock occurs if the seat belt retractor locks belatedly or fails to lock at all when accident forces are applied to it.

32. Skip lock is a phenomenon which occurs sporadically. It may or may not occur with a given belt retractor when accident forces are applied.

33. Plaintiff theorizes that skip locking occurred in Rachel Donohoe's case and contributed substantially to her injuries.

34. Defendants' ability to examine the Donohoe belt and determine whether or not skip lock occurred in this instance was in no way impaired by ARCCA's examination, disassembly or reassembly of the Donohoe belt.

35. Defendants do not contend that Donohoe was not wearing her seat belt at the time of the accident.[2]

36. Even if that were an issue in contention, there is virtually uncontrovertible evidence that Donohoe was wearing the belt at the time of the accident, since the belt was cut by rescue personnel so that she could be extracted from the vehicle.

37. As represented to the court at the August 17–18, 1994, hearing, plaintiff is not pursuing a theory of negligence or product liability based upon a manufacturing defect.

38. Because plaintiff is proceeding solely on a theory of design defect, the information which could be gleaned from testing or examination of the Donohoe belt, and no other belt, would be forensic evidence probative of how the Donohoe belt performed during the accident.

39. No evidence material to this case was destroyed or in any way altered by ARCCA's examination, disassembly and re-assembly of the Donohoe belt.

40. Defendants can obtain information to refute plaintiff's design defect theory through the testing of exemplar seat belts.

41. Defendants' ability to respond to and refute any issue raised in this case relative to an alleged defect in the design of the seat belt installed in the 1986 model Isuzu Trooper II has in no way been prejudiced or diminished by ARCCA's examination, disassembly or re-assembly of the Donohoe belt.

42. Plaintiff's experts took great care to preserve the Donohoe belt in the condition which they received it, consistent with their need to examine the belt to confirm or deny plaintiff's theory that a design defect in the retractor portion of the belt caused or contributed to Rachel Donohoe's injuries.

43. By preserving the entire disassembly and re-assembly on videotape, ARCCA enabled defendants to discern the condition of the belt pre-disassembly and the manner in which the disassembly was done and examination made of the component parts.

---

**2.** *See* Defendants' Statement of Undisputed Facts (record document no. 89) at 4 ¶ 3; Excerpts form

Deposition of Steven Miller (record document no. 92), Exhibit "1."

44. Protocols devised by the parties to govern inspection and examination of evidence by experts did not take effect until after the June, 1993 examination was conducted by ARCCA.

45. Federal regulations and industry testing standards cited by the defendants did apply to ARCCA's examination of the Donohoe belt.

46. ARCCA's June, 1993 examination and disassembly of the retractor did not breach any discovery protocol applicable to this case or violate any industry standard.

### C. Application of Controlling Law to the Facts

■ The evidence submitted at the August 17–18, 1994 hearing establishes as a matter of law that no harm was done by ARCCA's disassembly and examination of the Donohoe belt retractor, defendants suffered absolutely no prejudice as a result of the examination, and plaintiff committed no sanctionable conduct.

Plaintiff's theory of recovery by itself significantly lessens the importance of the Donohoe belt. Since she is proceeding on a theory of design defect only, any other belt of the same model will possess the same inherent defect and can be tested and examined for defects in the same manner as the Donohoe belt. Defendants will gain no more information as to the existence or non-existence of a design defect from testing the Donohoe belt than they will from testing exemplar belts. *See, Schmid, supra.*

Further, all that Cantor and Eisentraut did was disassemble the retractor mechanism. The videotape clearly demonstrates that they took the mechanism apart and nothing more. No destructive testing was performed on it, and no alterations were made to any part of it. None of the component parts was lost, damaged or replaced incorrectly. *See, Schmid* (Plaintiff's expert "did not destroy the allegedly defective product. This fact alone distinguishes most of the cases in which plaintiffs have been deprived of the use of evidence necessary to prove their claims.").

Plaintiff's experts had good reason to disassemble the retractor mechanism. Cantor testified that, although he could determine from other belts that a design defect existed in this particular type of retractor mechanism, he had to examine the Donohoe belt to determine whether such defects had any causal connection to the injuries sustained by Rachel Donohoe. Here, as in *Schmid,* "Disassembly was necessary to determine whether .. [the plaintiff] had a meritorious claim against the manufacturer." 13 F.3d at 79.

Also in plaintiff's favor is the fact that Cantor and Eisentraut carefully documented what was done with the belt. Their videotape of the procedure is the best possible record of how the component parts appeared pre-disassembly and how they were removed and put back in.

All of these facts and circumstances indicate beyond any doubt that there is no basis for sanctioning plaintiff for the June, 1993 disassembly of the belt retractor. Plaintiff's experts did nothing wrong in disassembling the retractor mechanism. They conducted all aspects of the disassembly and re-assembly procedure in a competent and professional manner and harmed no evidence of any possible relevance in this matter. Defendants were in no way prejudiced by the disassembly.

The conduct here differs sharply in all of these respects from that of the principals in both federal and state cases in which sanctions were imposed for the loss or destruction of allegedly defective products or product components. *See, e.g., Smith v. American Honda Motor Co.,* 846 F.Supp. 1217 (M.D.Pa.1994) (entire allegedly defective seat belt assembly was disposed of by plaintiff before it could be examined by defendant and without any attempt being made by plaintiff to document the condition of the assembly—precluding plaintiff from establishing his case in chief by proving a defect and preventing defendant from examining the belt assembly to confirm or deny plaintiff's allegations of defect); *Sipe v. Ford Motor Company,* 837 F.Supp. 660 (M.D.Pa.1993) (plaintiff's repair of allegedly defective engine block heater rendered it unavailable for testing or examination by defendant's expert, warranting

summary judgment in favor of the defendant); *Martin v. Volkswagen of America, Inc.,* 1989 WL 81296 (E.D.Pa.1989) (court granted judgment for defendant when the plaintiff alleged that defendant's automobile had a defective accelerator, but had sold the car).

In *Lee v. Boyle–Midway Household Products, Inc.,* 792 F.Supp. 1001 (W.D.Pa.1992), plaintiff alleged that defendant's drain cleaner was defective but had lost the product container. Because there was a very real issue as to whether it was in fact defendant's drain cleaner, as opposed to a competitor's product, which had injured plaintiff, the court granted judgment for defendant. In *Roselli v. General Electric Company,* 410 Pa.Super. 223, 599 A.2d 685 (1991), the plaintiffs lost an allegedly defective coffee carafe which shattered and injured the plaintiff-wife. The Pennsylvania Superior Court upheld the granting of summary judgment against plaintiffs. Summary judgment in defendant's favor was appropriate, the trial court held, because plaintiffs had deprived defendant of "the most direct means of countering their allegations via expert testing and analysis."

As opposed to all of these cases, plaintiff here has not lost the evidence, nor has she precluded defendants from performing any necessary tests.

### D.  Conclusions of Law

Based on the evidence presented at the hearing and the foregoing findings of fact, the court reaches the following conclusions of law:

1.  Plaintiff's experts did not destroy or alter in any manner the Donohoe seat belt.

2.  No fault attaches to plaintiff for the manner in which the Donohoe belt was disassembled and examined, since nothing improper was done with the belt and nothing was damaged.

3.  Plaintiff's experts did not violate any testing protocol agreed to in this case or any federal regulation or industry standard.

4.  Defendants have in no way been prejudiced by the examination and disassembly of the Donohoe belt performed by plaintiff's expert.

5.  Plaintiff's conduct is not sanctionable, since nothing improper was done and no evidence of any kind was destroyed or altered to any degree.

### E.  Conclusion

For all of these reasons, as the court indicated to the parties following the evidentiary hearing on the spoliation issue, defendants' motion for summary judgment will be denied.

## III.  PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

■ In her motion to compel production of documents, plaintiff indicates that the request was made on June 22, 1994. Counsel for Isuzu objected to the request because responses would have taken longer than the nine days left before expiration of the July 1, 1994, discovery deadline established by the court. It might also be noted that the responses, or more accurately, lack thereof, are dated July 15, 1994.

Considering the amount of time that has already been spent trying to obtain discovery, and the time spent disposing of the groundless motion for partial summary judgment discussed above, the court sees no reason defendants cannot provide the requested documents. Moreover, the tests and their results, along with the procedures involved, were already performed and should be available. Defendants will be directed to respond to plaintiff's supplemental request for production of documents.

## IV.  PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT EXAMINATION OF EVIDENCE

In her motion for leave to examine the seatbelt, which involves potentially destructive disassembly, plaintiff refers to defendants' delay in conducting their tests of the seatbelt. Defendants answer that they are awaiting the court's ruling on the spoliation of evidence issue. Presumably, then, the problem is moot: the spoliation of evidence issue has been disposed of, and the parties may conduct the necessary testing as desired. The instant motion will be denied,

with leave to renew should defendants continue to delay their testing.

## V. PLAINTIFF'S MOTION TO ALLOW ATTENDANCE OF PLAINTIFF'S REPRESENTATIVES AT CRASH TESTING AND OTHER DYNAMIC VEHICLE TESTING

■ Finally, plaintiff seeks an order directing that her representatives be permitted to attend any crash tests or other dynamic vehicle tests performed by defendants. Plaintiff contends that the presence of her representatives is necessary because "there is *no substitute* for Plaintiff's representatives' physical presence when cross examining Defendants' experts regarding such a crash test, its foundation and its results." Motion to Allow Attendance, etc., at 2 ¶ 6. Plaintiff provides no reason that reports of methodology and results would not be an adequate substitute. This is hardly the showing of "substantial need" and absence of alternative means for obtaining the information required by Fed.R.Civ.P. 26(b)(3). The instant motion will be denied.

\*     \*     \*

An order consistent with this memorandum shall issue.

### ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Defendants' motion (record document no. 89) for partial summary judgment on plaintiff's seat belt claims is denied.

2. Plaintiff's motion (record document no. 114) for leave to conduct examination of evidence is denied, but plaintiff has leave to renew the motion should defendants delay in performing the necessary testing.

3. Plaintiff's motion (record document no. 116) to compel production of documents is granted; defendants are directed to respond fully to plaintiff's supplemental request for production of documents.

4. Plaintiff's motion (record document no. 118) to allow attendance of plaintiff's representatives at crash testing and other dynamic vehicle testing is denied.